**In re GOLDBLATT BROS., INC., Debtor.**

**The FIRESTONE TIRE & RUBBER COMPANY, Plaintiff,**

v.

**GOLDBLATT BROS. INC., Defendant.**

No. 83 C 1434.

Bankruptcy No. 81 B 7075.

Adv. No. 81 A 2114.

United States District Court,
N.D. Illinois, E.D.

Oct. 24, 1983.

John R. Teitger, Kirkland & Ellis, Chicago, Ill., William J. Reifman, Mayer, Brown & Platt, Chicago, Ill., Robert B. Chatz, Arvey, Hodes, Costello & Burman, Chicago, Ill., for plaintiff.

Nachman, Munitz & Sweig, Chicago, Ill., for defendant.

## MEMORANDUM

LEIGHTON, District Judge.

This cause is before the court on the appeal of plaintiff Firestone Tire & Rubber Company from an order of the bankruptcy court denying its motion for summary judgment and granting the cross-motion for summary judgment of defendant Goldblatt Bros., Inc. For the following reasons, the order of the bankruptcy court is reversed, and the case is remanded for the entry of summary judgment in appellant's favor.

### I

This litigation arises out of a license agreement, executed in 1963, which authorized Firestone to operate tire centers within or near various Goldblatt retail stores. At these centers, Firestone tires and other of its automotive products were sold under Goldblatt's trade name. Firestone operated these outlets as an independent contractor, providing inventory, hiring employees, and managing each tire center. The license agreement provided that Goldblatt was to receive a royalty based on a percentage of the net sales generated by Firestone: this was 5% of the net sales if Firestone provided the real estate and building; 10% if the real estate and building were furnished by Goldblatt.

At the close of a business day, Firestone employees at each tire center gave cash and credit receipts from sales to the manager or cashier of the Goldblatt store associated with that center. Under the agreement, Goldblatt was required to return the funds to Firestone, after rendering a detailed monthly accounting of the sales generated by all the tire centers and subtracting the royalty payments. Goldblatt has produced uncontradicted evidence establishing that the proceeds it received from Firestone

were commingled in various bank accounts with funds that Goldblatt itself has generated. Equally undisputed, on the other hand, is that Goldblatt was never authorized by Firestone to engage in this commingling of funds. Moreover, Firestone states in an uncontested affidavit that Goldblatt never told it about, nor did it ever become aware of, the fact that the proceeds from the tire centers were being commingled. The license agreement between the parties did not purport to create an express trust with respect to these proceeds, nor did it require on its face that the funds be segregated in a separate account. The agreement simply stated that Goldblatt, after conducting an accounting, was to remit to Firestone its 90 to 95% of the net sales within 15 working days following each four-week accounting period.

On June 15, 1981, Goldblatt filed a Chapter 11 bankruptcy petition. As of this date, Goldblatt was obligated to return to Firestone over $900,000 that it had received in the weeks immediately preceding the filing of the petition. Firestone claims that it is entitled to administrative priority with respect to the tire center proceeds held by Goldblatt; it argues that these funds are not part of Goldblatt's bankruptcy estate under Section 541 of the Bankruptcy Code because they are being held in an implied trust by the bankrupt.[1] Goldblatt, on the other hand, contends that Firestone is not entitled to administrative priority because the parties were involved in a debtor-creditor, not in a trust, relationship. On the basis of the stated, undisputed facts, the parties filed cross-motions for summary judgment in the bankruptcy court. Summary judgment was entered for Goldblatt, the bankruptcy court concluding that the proceeds were not held in trust. Among that court's findings was a determination that the tire center proceeds were relinquished by Firestone "with the understanding that they could be commingled with Goldblatt's funds." Firestone maintains on appeal that the bankruptcy court erred in not granting summary judgment in its favor. After carefully reviewing the submissions of the parties and the opinion of the bankruptcy court, this court agrees with appellant.[2]

## II

Section 541 of the Bankruptcy Code, 11 U.S.C. § 541, provides that the estate of a bankrupt consists of all its legal or equitable interests in property at the time the bankruptcy action commences. Therefore, property held by a bankrupt in trust for another, where the bankrupt has no cognizable legal or equitable interest in such property, is not part of the bankruptcy estate. *See* 4A Collier, Bankruptcy ¶ 70.-25[1], at 339 (14th ed. 1964); Section 70 of Bankruptcy Act of 1898; Notes of Committee on the Judiciary, S.Rep. No. 95–989, 95th Cong., 2nd Sess. (1978) U.S.Code Cong. & Admin.News 1978, p. 5787 (same result with § 541 of 1978 Act). The law presumes, when one turns over to another proceeds to be held and later returned, that the party receiving the proceeds holds them in a fiduciary capacity and may not commingle them; in other words, there is a presumption that an implied trust has been created. *See Harvey Brokerage Co. v. The Ambassador Hotel Corp.*, 57 F.2d 727, 729 (S.D.N.Y. 1932); *Illinois Law & Practice: Agency*, §§ 12, 13 and 72, and cases cited;[3] *Illinois*

1. Firestone also unsuccessfully argued, in the alternative, before the bankruptcy court that the tire center proceeds were held in a constructive trust by Goldblatt. Since this court finds that the proceeds are held in an implied trust, it need not address Firestone's various constructive trust theories.

2. Section E(2)(b) of the general order issued by this court on December 25, 1982, provides that in certain instances a district judge, in reviewing orders of the bankruptcy court, need give no deference to the findings of the bankruptcy judge. It is immaterial in this instance whether this is a proceeding to which that section applies. Suffice to say that the decision of this court would be the same whether a *de novo* or a clearly erroneous standard of review is applied.

3. Relying on Paragraph 19(a) of the license agreement between the parties, the bankruptcy court found that Goldblatt was not an agent of Firestone, despite the well established rule that an agency is created when one puts property into the hands of another to keep or manage. Paragraph 19(a), however, only states that Firestone operated not as Goldblatt's agent, but

*Law & Practice: Bailments,* §§ 2, 11 and 12, and cases cited. This presumption, however, is not conclusive; it may be rebutted by establishing the existence of circumstances inconsistent with a trust relationship—such as an express agreement by the parties allowing the commingling of funds or requiring interest to be paid. *Harvey Brokerage Co. v. Ambassador Hotel Corp.,* 57 F.2d at 729.

Appellee Goldblatt maintains that this presumption, on which Firestone relies, cannot be sustained by the facts of this case. In support of its position, appellee, as did the bankruptcy court, relies primarily on *Lord's Inc. v. Maley,* 356 F.2d 456 (7th Cir. 1965), *cert. denied,* 385 U.S. 847, 87 S.Ct. 55, 17 L.Ed.2d 78 (1966), in which a shoe dealer entered into a license agreement with Lord's authorizing operation of shoe departments in its stores. Lord's business arrangement closely resembles that between Firestone and Goldblatt. Each of the shoe departments was staffed by the licensee's employees; the proceeds of all sales made under the agreement were turned over to a Lord's representative at the close of each business day; and Lord's, too, was required to make an accounting of the funds 15 days after the close of each month.

Despite these similarities, however, there are significant differences between *Lord's* and this case which cannot be ignored. As was not done in this case, the parties in *Lord's* inserted language into their license agreement which purported to create an express trust; in fact, the contract contained several clauses which provided that the proceeds from shoe sales were to be considered trust funds even if they were commingled with Lord's receipts. 356 F.2d at 457. As contemplated by the license agreement, Lord's did, in fact, commingle those funds with its general cash receipts. The Court of Appeals for the Seventh Circuit concluded that the license agreement, in effect, authorized the commingling that took place; the proceeds, it found, were turned over by the licensee "with the understanding that they could be commin-

gled with [Lord's] own funds" and that repayment would come out of Lord's general funds. 356 F.2d at 458. As the court further noted, the license agreement in that case, by condoning the commingling, virtually granted Lord's unrestricted use of the funds until the settlement date. *Id.* Any presumption that the funds were held in an implied trust was, therefore, defeated. Furthermore, the court concluded that an express trust had not been created, even though the parties in the governing agreement had invoked the term "trust" to describe their relationship. Standing alone, the use of trust language is meaningless; there can be no trust, express or implied, where the parties have consented to the commingling of funds. *Id.* Accordingly, the business arrangement in *Lord's* was determined to be a simple debtor-creditor relationship, and the licensee was denied administrative priority.

■ In this case, there is no basis for the court to conclude that, as in *Lord's,* proceeds were given to the bankrupt with the understanding that they could be commingled with its general funds. The uncontradicted evidence previously described by this court clearly establishes that Firestone never knew of or authorized Goldblatt to commingle the proceeds from tire center sales. Moreover, there is no language in the license agreement which, as in *Lord's,* sanctions commingling. There is no rebuttal in this case of the presumption that the proceeds, which Firestone placed temporarily in the possession of Goldblatt, were held in trust and, consequently, should not have been commingled. The conclusion reached by the bankruptcy court that there was an understanding that the tire center proceeds could be commingled is clearly erroneous.

Goldblatt, however, directs the court's attention to *In re Morales Travel Agency,* 667 F.2d 1069 (1st Cir.1981). There the Court of Appeals for the First Circuit, relying in part on *Lord's,* held that a travel agency which sold airline tickets did not hold the proceeds from those sales in trust for the

as an independent contractor. That section of the agreement does not prevent a finding that

Goldblatt was Firestone's agent with respect to the funds that were held.

airlines, despite language in a governing agreement to that effect, when there was no express requirement that the travel agency segregate the funds in a separate account.[4] 667 F.2d at 1070–1072. The airlines, therefore, were denied administrative priority with respect to sales proceeds held by the travel agency when it filed its bankruptcy petition.

Arguing from *Morales Travel,* Goldblatt reasons that a trust relationship could not arise under the facts of this case because the license agreement did not expressly require that the proceeds it received from Firestone be segregated in a separate account. Appellee's reliance on *Morales Travel* is misplaced, however. In that case, it was clear that the parties had not created an implied trust with respect to the proceeds generated by the travel agency's sale of airline tickets. The proceeds that the agency held came from customers, not the airlines. Since the airlines never had possession of the proceeds, it was clear that these funds were not being held for them in an implied trust: the airlines had not given any funds to the travel agency, intending that they be held and later returned—an element essential to establishing an implied trust. Consequently, as in *Lord's,* the court in *Morales Travel* confronted the question whether the talismanic incantation of trust language in the governing agreement was sufficient to create a trust in a situation where a trust could not be implied. *See* 667 F.2d at 1071–1072. Under this circumstance, the court held that merely reciting the term "trust" was not enough; the parties had to create a genuine trust mechanism by expressly providing, for instance, that funds be held separately. *Id.* at 1071.

*Morales Travel,* therefore, does not hold, as Goldblatt argues, that the parties must expressly provide for the segregation of proceeds in a situation where there is, as in this case, a presumption that an implied trust is in place. Implicit in an implied

trust is the understanding that the party receiving proceeds holds them in a fiduciary capacity and, consequently, is not to commingle them; to require this understanding to be explicit in all circumstances would render the concept of an implied trust meaningless.

The undisputed facts establish that the tire center proceeds are held by Goldblatt in an implied trust for Firestone. Appellant, therefore, is entitled to administrative priority with respect to the funds that are the subject matter of this litigation. Accordingly, the order of the bankruptcy court is reversed, and the case is remanded for entry of an order granting Firestone's motion for summary judgment and denying Goldblatt's cross-motion for summary judgment, and for further proceedings not inconsistent with this Memorandum.

So ordered.

---

4. As Goldblatt points out, toward the close of *Lord's,* the court did note in dictum that the parties could have avoided the problems that arose if their contract had expressly provided that funds collected were to be kept in a separate account. *See* 356 F.2d at 459. When the opinion is read as a whole, it is apparent, however, that this observation does not constitute a declaration that a trust relationship may arise only when the parties expressly require the segregation of proceeds.